E-FILED
Tuesday, 19 July, 2005  02:01:06 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 05-CR-30025 |
| JESUS SANCHEZ, | ) ) ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This cause comes before the Court on Defendant's Motion to Suppress Evidence [37]. The motion is fully briefed, and pursuant to Local Rule 72.1, the District Judge has referred the matter to me for an evidentiary hearing and Report and Recommendation. After carefully considering all of the submissions of the parties, hearing evidence on the matter, and pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that the Motion to Suppress be DENIED.

I.  BACKGROUND AND FACTUAL FINDINGS[1]

Defendant Jesus Sanchez is charged with conspiracy to distribute at least five kilos of cocaine and possession with intent to distribute at least five kilos of cocaine.

---

[1] **This Report and Recommendation is prepared without the benefit of a transcript.**

The evidence presented in open court on July 13, 2005, established that on January 29, 2005, at approximately 5:13 p.m., Illinois state police stopped a Dodge pick-up truck for speeding on Interstate 55 at milepost 110, near Williamsville, Illinois. The truck was pulling a camper-trailer. Defendant Robert Quinlan was driving the truck. Quinlan consented to a search of his vehicle and the trailer. During the search, officers found 41 kg of cocaine in two duffle bags located in a compartment in the floor of the trailer. Jesus Sanchez does not challenge the validity of this stop and search.

Defendant Quinlan, after being informed of his *Miranda* rights, admitted he was being paid to transport something illegal to Chicago, Illinois. He claimed that he did not know what he was carrying, only that he knew it was an illegal substance. His instructions were to travel to a truck stop in the Chicago area. Upon arrival, he was contacted by an individual only known to him as No. "237," via a Nextel cellular telephone. Quinlan agreed to cooperate and to conduct a controlled delivery of the cocaine at the direction of law enforcement officials.

On January 30, 2005, Quinlan continued his trip under the supervision of law enforcement officials. Law enforcement officials began to monitor Quinlan's Nextel cellular telephone conversations. Quinlan contacted "237" after he reached the Chicago area. Quinlan was eventually directed to travel south on Interstate 57 to exit 308 in Kankakee, Illinois. There, he was told to park in a parking lot located at the rear of a hotel near the exit. Upon arriving at the hotel parking lot, Quinlan

parked on the western-most edge of the parking lot. The hotel building sat along the eastern edge of the parking lot. When Quinlan arrived, the lot was almost deserted. Very few cars were parked in the front or the rear of the hotel. Law enforcement officials then equipped Quinlan with a radio transmitting device. The device transmitted Quinlan's conversations, including his Nextel telephone conversations, and also recorded those conversations.

By the time Quinlan arrived, law enforcement officials had established surveillance around the hotel. Illinois State Police Master Sargent Jose Camacho was one of the supervisors in charge of the operation. He was in an automobile parked on a residential street approximately 30 feet west of the western edge of the hotel parking lot. He watched the vehicle containing the cocaine from that vantage point. He also saw the parking lot from that spot. The parking lot was very well lit and almost deserted. Several other officers were observing the hotel and parking lot (and the area in the vicinity of the hotel) from other vantage points. The officers were communicating with each other via cellular telephones and radios during the surveillance.

At approximately 8:00 p.m., Camacho observed two Hispanic men walk in a northerly direction along the eastern edge of the parking lot. They disappeared from his view. Shortly thereafter, he observed them walk back toward the south end of the parking lot. Several officers commented on the movement of these individuals.

The officers also could listen to Quinlan's transmissions over police radios. The recording and transcript of Quinlan's conversations were admitted into evidence at the request of both the Government and Jesus Sanchez.  <u>Joint Exhibit</u> 5. Excerpts of the calls between Quinlan and "237" while Quinlan was waiting in the parking lot reveal the following. Illinois State Police Special Agent James Jackson also spoke to Quinlan during this time. Jackson is referred to as "Agent" on the transcript.

| | |
|---|---|
| Quinlan: | I didn't quite understand you, you're saying they, they confirmed their coming?  Or something? |
| 237: | Excuse me, is there any chance that you can start taking the box out of, of the place? |
| Quinlan: | Uh, yeah.  This is where the back, uh, the back of the hotel for parking autos that's the only one I can pickup. |
| 237: | Yes, but, uh, I was as if, if you have the chance to take them out so that you can have them ready for them, when these guys show up, just give it to them. |
| Quinlan: | Uh, I see what you're saying, okay. |
| (Pause) | |
| Quinlan: | Hello? |
| Agent: | I didn't understand what you was saying. |
| Quinlan: | He wants me to go back there and prepare, uh, it for 'em so that when they get here, they can just take it and go. |
| Agent: | No, you just stay in the truck.  We don't want you to go back to the camper. |

. . . .

237: Did you get those things out?

Quinlan: I haven't seen hide or hair of anybody, uh, I was kinda waiting 'till someone showed up so, uh, it's not sitting out in the open.

237: Yes, well, remember, remember what I told you they want, they wanted to pick 'em up and then when they show up you can, you know, hand it to them

Quinlan: Okay, so have 'em up inside ready for 'em. They're gonna come in and get 'em?

237: Well, just, uh, open it, take 'em out so that when they show up, just give it to them, and that way you don't, they wouldn't be able to see so many vehicles at the same time.

Quinlan: Okay.

. . . .

Quinlan: Okay, my friend, I got 'em out and I got 'em ready, uh, they're real easy so they can just grab 'em and go.

237: Okay. Alright. Let me tell these guys, so they can, they need (unintelligible) from you, they're just waiting for you, to pick them up. They're on their way. Let me call them.

Quinlan: Okay.

(Extended Pause)


Quinlan: Okay, I don't know if you hear me, one guy's walking out of the back of the motel getting into a van back here. Hold on a minute. Hello my friend.

**Page 5 of 14**

> 237: Okay, it's gonna, it's gonna be, uh, a mini-vehicle, like a mini-van. And, uh, it's gonna be the, the friend, he will ask your nickname, no one we used to call you.
>
> Quinlan: Okay. Uh, I got an eyeball on it.
>
> 237: Sorry.
>
> Quinlan: Yep, I got an eyeball on it. It's here now.
>
> 237: Okay, just give it to him and that's it, you can leave.
>
> Quinlan: Okay, goodbye.
>
> 237: You can give me a call when you get back on the road, please.
>
> Quinlan: Yes, sir. All right, I'm getting out, they're here.

Join Exhibit 5, at 2-6.

At approximately 8:30 p.m., Camacho saw one of the two Hispanic men that he previously observed get into a green minivan parked in the lot. The man drove the minivan across the parking lot, and parked next to Quinlan's vehicle. The driver of the minivan, later identified as Defendant Efren Sanchez, began to take possession of the cocaine. At that time, Camacho gave the signal, and law enforcement officers converged on the hotel and took Efren Sanchez and Quinlan into custody.

As the officers converged on the hotel, they observed Defendant Jesus Sanchez and a 16 year old juvenile coming to the in front of the hotel from the North side of the hotel. Officers handcuffed Jesus Sanchez and the juvenile and held

them just outside the front door of the hotel. Camacho drove to the hotel from his vantage point. When he reached the front door area of the hotel, he told one of the officers at the front of the hotel that Jesus Sanchez was dressed like the other Hispanic man that he saw walking with Efren Sanchez in the hotel parking lot at approximately 8:00 p.m. Camacho then continued to the back of the hotel where the two vehicles were located. Illinois State Police Special Agent Tim Hanson also converged on the hotel from location a short distance away. He arrived about one or two minutes after Camacho gave the signal. When he arrived, he talked to the juvenile. Hanson testified that Jesus Sanchez and the juvenile were in investigative detention at this time. He stated that the officers wanted to determine whether they were involved with Efren Sanchez in picking up the cocaine. Hanson asked the juvenile, "How did you guys get here?" The juvenile said that they came in a green minivan.

    Hanson and Illinois State Police Special Agent Timothy Gainer went into the hotel to speak to the front desk clerk. The clerk told them that Efren Sanchez had rented room number 205. Hanson went to inspect the room. Gainer stayed with the front desk clerk. The front desk clerk saw through the front door or window of the hotel the juvenile who was being held by officers, along with Jesus Sanchez. The clerk said that the juvenile accompanied Efren Sanchez when he rented the room. The clerk stated that the juvenile acted as Efren Sanchez's interpreter.

About seven minutes after the officers converged on the hotel, Quinlan told Special Agent Jackson that another man was with Efren Sanchez at the hotel. Joint Exhibit 5, at 7-8.[2] Quinlan noticed Efren Sanchez and the other man as they were sitting in a van on the other side of parking lot. Quinlan told Jackson that the other man was heavy set. Quinlan described the other man's clothes as a "dark top and bottom." Id. at 8. Jesus Sanchez matched this general description.

Law enforcement officials then completed their investigation at the hotel and left together, to the Kankakee, Illinois, police station. Officers took Quinlan, Efren Sanchez, and Jesus Sanchez with them to the Kankakee police station. The entire investigation at the hotel, from the time that Camacho gave the signal to converge on the hotel until the officers left with the Defendants, took 10 to 20 minutes. Once at the police station, officers interrogated Jesus Sanchez. As a result of the interrogation, officers searched Jesus Sanchez's residence and found certain items.

Defendant Jesus Sanchez claims there was no probable cause and therefore his arrest was unreasonable under the Fourth Amendment. Defendant Jesus Sanchez argues law enforcement did not even have the basis to conduct an investigative detention. Defendant Jesus Sanchez also claims the subsequent

---

[2]**The timing is based on the elapsed time on the recording from the transmitting device placed on Quinlan. Quinlan's conversation with Jackson regarding the second man is also recorded on Joint Exhibit 5.**

consent search and any statements he made should be suppressed as fruit of the poisonous tree.

## II.  ANALYSIS AND CONCLUSIONS OF LAW

A.  The Stop

An investigative detention is governed by the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968).  Under Terry, the stop must be justified at its inception and be reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Finke, 85 F.3d 1275, 1279 (7th Cir. 1996).  "An officer may make a Terry stop when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity ."  United States v. Place, 462 U.S. 696, 702, (1983).   The constitution restricts the duration of a seizure to the time necessary to fulfill the seizure's purpose.  See Florida v. Royer, 460 U.S. 491(1983) (plurality)(White, J., concurring) ("[A]n investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").

Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  United States v. Cortez, 449 U.S. 411, 417 (1981).  "Reasonable suspicion must be supported by articulable fact that criminal activity is afoot."  United States v. Swift, 220 F.3d 502, 506 (7th Cir. 2000) (citing Terry, 392 U.S. at 30).  The government bears the burden of

establishing that there was reasonable suspicion. United States v. Longmire, 761 F.2d 411, 417 (7th Cir. 1985).

In the present case, the Court believes that under the totality of the circumstances, law enforcement possessed a reasonable, articulable suspicion that Defendant Jesus Sanchez had been engaged in criminal activity. The facts available to law enforcement at the time Defendant Jesus Sanchez was detained warranted a person of reasonable caution to believe that the actions taken were necessary and appropriate. United States v. Griffin, 150 F.3d 778, 783 (7th Cir., 1998). The initial investigative detention of Defendant Jesus Sanchez was based upon reasonable suspicion, justified at its inception, and is an example of good police work. The person identified as "237" repeatedly indicated that more than one person would be picking up the cocaine. He told Quinlan that "they" or "these guys" were going to get the cocaine from him. Camacho saw two Hispanic men in the rear of the hotel earlier that evening. Officers had a reasonable basis to temporarily detain Jesus Sanchez at the front of the hotel to determine if he was one of the persons that "237" said was coming to get the cocaine.

After Defendant Jesus Sanchez was detained, law enforcement learned additional facts which further heightened their existing reasonable suspicion. After being detained only minutes, the juvenile told Hanson that they came to the hotel in a green minivan. This matched the vehicle that Efren Sanchez used to pick up the cocaine. The hotel front desk clerk identified the juvenile as the person that

accompanied Efren Sanchez when he rented Room 205. Camacho identified Jesus Sanchez as matching the description of the man who was with Efren Sanchez earlier that evening. Quinlan told Jackson that another man was with Efren Sanchez. Quinlan described the other man as heavy set with dark clothes. Jesus Sanchez matched this general description.

The Court finds that <u>at this point in time</u> there was more than ample evidence to warrant any reasonably prudent law enforcement officer to believe that the Defendant Jesus Sanchez was in fact involved in the cocaine transaction. In light of <u>all</u> these circumstances, the Court concludes that at this point in time there was sufficient probable cause to arrest Defendant Jesus Sanchez. See <u>Gerstein v. Pugh</u>, 420 U.S. 103, 113, 95 S.Ct. 854 (1975) (it is well established that under certain circumstances law enforcement may lawfully arrest persons without an arrest warrant).

The Court finds the initial <u>Terry</u> detention was lawful and also finds that probable cause to arrest the Defendant perfected very soon thereafter. Law enforcement's suspicions of the Defendant Jesus Sanchez were not dispelled during the initial detention, instead their suspicions were heightened which authorized the continued investigative detention and the eventual arrest of the Defendant. See <u>United States v. McGrath</u>, 89 F.Supp.2d 569, 579-80 (E.D.Pa., 2000). Probable cause to arrest existed as a matter of law before Defendant Jesus Sanchez was transported to the Kankakee Police Station.

Jesus Sanchez argues that "237's" references on the telephone to "they," "them" and "these guys" did not give law enforcement officers a reason to believe that more than one person was involved in picking up the cocaine from Quinlan. He argues that Quinlan and "237" used the pronouns "they" and "them" colloquially to refer to an unidentified person rather than to indicate a plurality of people. He points out that Quinlan stated that he saw one man get into the minivan, yet Quinlan said, "they're here," when the one man pulled the minivan up to Quinlan's vehicle. This argument is not persuasive. Even if Quinlan and "237" were speaking colloquially, the plain meaning of the words used indicate that more than one person was picking up the cocaine. The officers that heard the conversation had a reasonable basis to believe that more than one person was involved. Law enforcement had a reasonable basis to stop and detain Jesus Sanchez to determine whether he was involved.

Jesus Sanchez also argues that he was arrested without probable cause when the officers converged on the hotel and handcuffed him. The Court disagrees. Officers may handcuff individuals that they temporarily detain during an investigation. Handcuffing is a reasonable procedure to maintain officer safety. United States v. Smith, 3 F.3d 1088, 1094 (7th Cir. 1993). The fact that he was handcuffed did not turn the otherwise proper investigative detention, based on reasonable suspicion, into an improper arrest. By the time that the officers took

Jesus Sanchez to the police station, they had probable cause to arrest him as a matter of law.

B.     The Statement of the Defendant and Consent Search

Defendant's motion, in conclusory fashion, asks that any statement made by Defendant and all evidence seized were the fruits of an unlawful arrest and therefore must be suppressed. Defendant does not *per se* attack the voluntariness of his *Miranda* waiver. The Defendant's motion to suppress does not directly attack the consent search.

The Court has previously found that the investigative detention was lawful. The Court has also found that as a matter of law, probable cause to arrest the Defendant perfected very soon thereafter. Therefore, an analysis of suppression of the statements and search under a "fruit of the poisonous tree" does not have to be conducted.

## III. CONCLUSION

For all the above reasons, I strongly recommend that Defendant's Motion to Suppress Evidence [37] be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after being served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1).   Failure to file a timely objection will constitute a waiver of

objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.


ENTER:  July 19, 2005

                                                         s/ Byron G. Cudmore
                                    _____
                                            BYRON G. CUDMORE
                                  UNITED STATES MAGISTRATE JUDGE