IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,   )   <br>                                                            )   <br>              Plaintiff,         )   <br>                                                            )   <br>      v.                                      )   <br>                                                            )   <br> JESUS SANCHEZ,                     )   <br>                                                            )   <br>              Defendant.      )   | No.  05-30025 |

## ORDER

JEANNE E. SCOTT, U.S. District Judge:

Before the Court is Defendant's Objection to the Magistrate Judge's Report and Recommendation Denying the Defendant's Motion to Suppress Evidence (d/e 46).  Defendant Jesus Sanchez (Defendant) moved to suppress evidence of any statements he made and items seized from his residence as fruits of the poisonous tree following his arrest; he contends there was no probable cause for his arrest.  See Defendant Jesus Sanchez' Motion to Suppress Evidence (d/e 37).  The Court referred the Motion to U.S. Magistrate Judge Byron G. Cudmore to conduct a hearing and file a report and recommendation.  On July 13, 2005, Magistrate Judge Cudmore held an evidentiary hearing on the Motion; he then filed a Report and

1

Recommendation that the Motion be denied on July 19, 2005 (d/e 44). On July 29, 2005, Defendant filed his written objection to the Report and Recommendation . The Court reviews Magistrate Judge Cudmore's finding that the police officers had a reasonable basis for an investigative stop of Defendant near the front on the hotel in question, which thereafter ripened into probable cause for arrest, according to a de novo standard. 28 U.S.C. § 636(b)(1)(C).

The Court has reviewed the Motion to Suppress, the Government's Response filed July 15, 2005 (d/e 43), a Transcript of the evidentiary hearing held before Magistrate Judge Cudmore on July 13, 2005 (d/e 48), the exhibits introduced at the hearing, the Defendant's Objection to the Magistrate Judge's Report and Recommendation Denying the Defendant's Motion to Suppress Evidence, and Defendant's Memorandum in Support of his Objection to the Magistrate's Report and Recommendation Denying Defendant's Motion to Quash Arrest and Suppress Evidence (d/e 47). Defendant acknowledged at the hearing, through counsel, that he was not challenging the statements given and his consent to search on the basis that they were involuntarily given. Transcript, p. 6. The focus of the inquiry, thus, is whether the officers who stopped Defendant in front of the hotel

had either probable cause to arrest or a reasonable suspicion that criminal activity was afoot such that a brief detention of Defendant to investigate was warranted, as outlined in Terry v. Ohio, 392 U.S. 1 (1968). If a Terry stop was warranted, the next issue is whether probable cause to arrest existed by the time the officers removed Defendant from the hotel area.

The Court notes from its review of the transcript and exhibits that the Magistrate Judge's Report's recitation of the facts (stated in Part I of the Report) is accurate, and this Court adopts those statements in Part I of the Magistrate's Report as part of its findings. There was also evidence at the hearing that at least two of the officers on surveillance heard a radio communication stating that two individuals were on foot at the Northeast corner of the hotel watching the vehicle in which the drug transaction between Quinlan and Efren Sanchez was occurring; Agent Haas also indicated he heard radio comments that the two on foot then departed at the time Efren Sanchez was arrested. Haas Affidavit, Exhibit 4; Transcript, pp. 12, 38 & 41. The Government attorney indicated he had not been able to identify the person who made that broadcast and, accordingly, did not rely heavily on it. Transcript, p. 145.

In evaluating whether there was probable cause for arrest, the Court

turns first to the information that the officers had at the time they stopped the Defendant and the juvenile in the front of the hotel.  At that point, without considering the purported radio communication about the two people watching the transaction from the Northeast corner of the hotel, the officers knew that one person driving a green minivan had met Quinlan (in the parking lot behind the building), obtained the drugs and been arrested; they knew that at least two people had been expected to come and pick up the drugs from Quinlan, based on the communications from 237 to Quinlan which the officers heard:

> . . . take them (the drugs) out so that you can have them ready for them, when these guys show up, just give it to them; . . . remember what I told you they want, they wanted to pick 'em up and then when they show up you can, you know, hand it to them; . . . take 'em out so that when they show up, just give it to them . . . Let me tell these guys, so they can, they need (unintelligible) from you, they're just waiting for you, to pick them up.  They're on their way.  Let me call them.

Joint Exhibit 5, excerpts of 237's statements to Quinlan (emphasis added). The officers also knew that few people were staying at the hotel -- the parking lot was nearly deserted.  Transcript, pp. 22, 24.  They knew the Defendant and the juvenile were walking from the back of the hotel area to the front immediately after the arrest of Efren Sanchez; they knew that the

4

Defendant matched the description (with respect to general description and clothing) of one of those who had been seen walking behind the hotel 20-30 minutes earlier because officers had called out the description on the police radio when these individuals walked along behind the hotel. Transcript, pp. 83-84.

Thus, at the point of the stop of the Defendant, there was no doubt that criminal activity was afoot around the hotel; 41 kilograms of cocaine had just been transferred to Efren Sanchez. Agent Hansen testified at the hearing that the officers stopped the Defendant and the juvenile and detained them in front of the hotel to confirm whether they were involved in the drug transaction or not. Transcript, p. 18. This stop was reasonable. Defendant and the juvenile were detained in front of the hotel about 20 minutes before they were taken to the Kankakee Police Department. Transcript, p. 5. The Court finds from the evidence that the initial stop and detention of Defendant qualifies as a Terry stop. In light of the repeated references by 237 to two or more people that would come to collect the drugs from Quinlan, the paucity of other people at and around the hotel, and Defendant's coming around from the back of the hotel (where the arrest of Efren Sanchez had just been made) immediately after Efren Sanchez'

5

arrest, it was reasonable for the officers to suspect that Defendant was also engaged in the criminal activity involving the drugs.

Agent Hansen testified that he came to the front of the hotel within two minutes of the signal being given to arrest Efren Sanchez. By that time Defendant Jesus Sanchez had been handcuffed by other officers, and the juvenile was also being detained there. Hansen said he immediately asked the juvenile: "How did you guys get here?" The juvenile responded that they had come in a green minivan. Since the only other "guy" being detained in front of the hotel then was the Defendant, it was logical for the officers to think that the juvenile meant that he and the Defendant had come there in a green minivan. The officers also knew at that point that Efren Sanchez had just driven a green minivan next to Quinlan's vehicle in the back of the hotel when he obtained the drugs from Quinlan. Master Sergeant Comacho knew, by the time he went to the front of the hotel, that Efren Sanchez had also been one of the two walking in the back parking lot earlier, and he recognized the Defendant as the other party who had been walking behind the hotel earlier with Efren Sanchez. Other officers in front of the hotel had already realized that the Defendant matched the description of one of the two who had been walking behind the hotel before

the drug transfer occurred; the description had been broadcast to the officers at the time the men were seen walking. Transcript, pp. 90, 92.

Consequently, within about ten minutes of the initial detention, officers had additional information that reasonably led them to believe that Defendant and the juvenile had come to the hotel together with Efren Sanchez and that Defendant and Efren Sanchez had walked together part way through the parking lot where the drug transfer was to occur, and then back, 20-30 minutes prior to the transfer of drugs. In the next ten minutes officers learned that Efren Sanchez had rented a hotel room there, using the juvenile as an interpreter for him in conversing with the hotel clerk. At that point, by adding together all of the information known to the officers, there was probable cause to arrest Defendant. The suspicions the officers had when they initially stopped Defendant had been confirmed -- they had probable cause to believe Defendant had come to the scene of the drug transfer with Efren Sanchez and the juvenile, that Defendant and Efren Sanchez had checked out the vehicles present in the lot behind the hotel shortly before the drug transfer, and that he was part of the "they," referenced by 237, who would pick up the drugs. While no one bit of information may have given rise to probable cause, all facts considered

7

together did.

Thus, the initial stop was justified; it was in a public place; and it lasted less than 20 minutes before probable cause developed. The fact that the officers immediately handcuffed Defendant did not convert this stop into a full-blown arrest. Officers may handcuff an individual for safety purposes, even during a stop. United States v. Smith, 3 F.3d 1088 (7th Cir. 1993). Here the officers knew that people were coming to meet Quinlan to obtain 41 kilograms of cocaine. It would not be unusual for those obtaining such a quantity of drugs to be armed. Immediately handcuffing Defendant did not convert the initial stop into an immediate arrest.

Defendant has cited United States v. Ingrao as support for suppression of the evidence. Ingrao, 897 F.2d 860 (7th Cir. 1990). In that case while the police were surveilling one person's residence they observed another individual walking between two homes that had previously been used in another transaction. The individual walking was carrying a bag which he then placed in the trunk of a car. Officers stopped him and searched the bag, finding four kilograms of cocaine. The Seventh Circuit ruled that the evidence should have been suppressed because there was no evidence linking the defendant to the person who was the known criminal

8

whose residence the police were watching. The court also found nothing suspicious in the defendant's behavior which was observed by the police.

Here, however, the juvenile provided the linkage between Defendant and Efren Sanchez. They came to the hotel together, and their illegal purpose at the hotel had been conveyed to the officers by 237 and Quinlan. The Court finds <u>Ingrao</u> distinguishable from the facts of this case.

THEREFORE, for the reasons stated herein, the Court overrules the objection to Magistrate Judge Cudmore's Report and Recommendation, accepts the Report, and denies the Motion to Suppress (d/e 37). Evidence of the statement and consent to search, given by Defendant at the Kankakee Police Department, may be introduced into evidence by the Government at trial.

IT IS THEREFORE SO ORDERED.

ENTER: August 15, 2005.

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE